Robert B. REICH, Secretary of Labor, United States Department of Labor, Plaintiff–Appellee,

v.

MISS PAULA'S DAY CARE CENTER, INC., and Janice Hartman, Defendants–Appellants.

No. 93–3706.

United States Court of Appeals, Sixth Circuit.

Submitted June 23, 1994.

Decided Oct. 19, 1994.

William J. Stone, Lois R. Zuckerman (briefed), U.S. Dept. of Labor, Office of the Sol., Washington, DC, Benjamin T. Chinni, Office of the Sol., U.S. Dept. of Labor, Cleveland, OH, for plaintiff-appellee.

Ronald R. Calhoun (briefed), Gallipolis, OH, for defendants-appellants.

Before: KEITH, BOGGS, and BATCHELDER, Circuit Judges.

BOGGS, Circuit Judge.

This case raises a question of statutory construction: when does a facility that cares for children younger than compulsory school age become a "preschool"? Under 29 U.S.C. § 203(s)(1)(B), "preschools" must comply with the same minimum-wage and maximum-hour employment standards that apply to other enterprises subject to the federal Fair Labor Standards Act ("FLSA"). Appellants, who describe their business as a "child day care center," contend that they are not governed by FLSA because their day care operation is not a "preschool." The Secretary of Labor disagrees. The parties consented to

disposition of the case by a magistrate judge, 28 U.S.C. § 636(c), and he found for the Secretary. We hold that Appellants are governed by the FLSA.

## I

Miss Paula's Day Care Center, Inc. ("Miss Paula"), jointly owned by co-defendant Janice Hartman and her daughter, Paula Back, provides quality custodial care for very young children in the Appalachian region of southeastern Ohio. It has 12 employees and has grown to care for more than 60 children. The young charges range in age from "infants and toddlers" to those between ages three and six. Many of the children's parents are low-income, working mothers or college students who are hard-pressed to pay for child care. Unlike pure babysitting services, Miss Paula provides its charges with daily activities targeted towards their intellectual stimulation and enrichment. Miss Paula has been able to remain affordable for its working-class clientele by paying its staff below the federal minimum wage. The proprietor herself earned only $13,000 in 1991 from her 50% share of the business.

Miss Paula has operated since 1985 as a state-licensed day care center, certified by the Ohio Department of Human Services under Ohio Rev.Code Ann. §§ 5104.01–.03. Miss Paula has never sought licensing under the separate statutory provisions that define the different institutional category of "preschool." Ohio Rev.Code Ann. §§ 3301.52 et seq., 3313.646.

The Secretary of Labor ("the Secretary") regards Miss Paula as a "preschool," at least in the statutory sense of the word. Thus, Miss Paula has learned "overnight" that it must pay minimum wages. While this sudden development may enable Miss Paula to hire future staff members from a wider pool of applicants, it will also strain its tight budget.[1] Indeed, as part of the Secretary's findings, Miss Paula has been assessed $18,-147.89 in back wages and interest that it must pay employees who had been receiving salaries below minimum wage. Appellants

---

1. Although Janice Hartman, Miss Paula's co-owner, works full-time at the center, the magistrate judge found that her total draw (wages and half of the total profits) in 1991 came to only $13,000.

contend that it is wrong to characterize Miss Paula as a "preschool" and that such an assessment may ultimately drive the day care center out of business. However, although public policy issues are present, this appeal primarily concerns statutory construction.

Miss Paula tries to show that: (1) "child day care centers" are different from "preschools" because they do not provide the kinds of learning programs that rise to the level of "preschool" education; (2) since "child day care centers" are distinct from "preschools," they would have been separately denominated in 29 U.S.C. § 203(s)(1)(B) if Congress had intended to extend the FLSA to "child day care center" staff, but Congress chose not to; and (3) since "child day care centers" are merely custodial, not educational, in nature, the FLSA should not apply to them because they are different from the other institutions that are enumerated in 29 U.S.C. § 203(s)(1)(B).

## II

■ An employer must pay the federal minimum wage, and overtime rates for work that exceeds the federal maximum-hour ceiling, to any employee who is: (1) engaged in commerce or in the production of goods for commerce, or (2) employed in an enterprise engaged in commerce or in the production of goods for commerce. 29 U.S.C. §§ 206, 207. "[W]ithin the tests of coverage fashioned by Congress, the Act has been construed liberally to apply to the furthest reaches consistent with congressional direction." *Mitchell v. Lublin, McGaughy & Assocs.*, 358 U.S. 207, 211, 79 S.Ct. 260, 264, 3 L.Ed.2d 243 (1959).

[An "e]nterprise engaged in commerce or in the production of goods for commerce" means an enterprise that—

is engaged in the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises of such institution, a school for mentally or physically handicapped or gifted children, a *preschool*, elementary or secondary school, or an institution of higher education. . . .

29 U.S.C. § 203(s)(1)(B) (emphasis added).[2]

The statute further defines certain of its terms. An " '[e]lementary school' means a day or residential school which provides elementary education, *as determined under State law*." *Id.* § 203(v) (emphasis added). A " '[s]econdary school' means a day or residential school which provides secondary education, *as determined under State law*." *Id.* § 203(w) (emphasis added). However, the statute does not define a "preschool."

The statute's legislative history casts little light on whether Congress considered custodial "child day care centers" to be "preschools." The basic text of 29 U.S.C. § 203(s)(1)(B) was adopted in the Fair Labor Standards Amendments of 1966.[3] In those amendments, Congress extended the FLSA for the first time to employees of elementary and secondary schools.[4] However, "any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools" was explicitly exempted from coverage, as a specified example included under the general exemption for employees "in a bona fide executive, administrative, or professional capacity."[5]

**2.** Fair Labor Standards Amendments of 1989, Pub.L. No. 101–157, § 3(s), 103 Stat. 938 (1989).

**3.** Pub.L. No. 89–601, § 102(a)(1), 1966 U.S.C.C.A.N. (80 Stat.) 978, 978.

**4.** The Senate had omitted these employees from its proposed amendments, feeling that the matter had not been adequately addressed in public hearings and expressing "concern[] about the impact which a possible increase in wages for such employees might have upon local school districts that depend in part upon tax dollars for operating revenues." S.Rep. No. 1487, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.C.C.A.N.

3002, 3010. However, the conference committee adopted the House bill, H.R. 13712, 89th Cong., 2d Sess. (1966), which extended the coverage to employees of elementary and secondary schools. *See* H.R.Conf.Rep. No. 2004, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.C.C.A.N. 3047, 3048. Thus, it can be inferred that Congress knowingly decided that extension of the FLSA justified the additional financial burdens that the schools would face.

**5.** Pub.L. No. 89–601, § 214, 1966 U.S.C.C.A.N. (80 Stat.) 978, 986; *see also* H.R.Conf.Rep. No. 2004, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.C.C.A.N. 3047, 3048.

Such employees remain exempt today. 29 U.S.C. § 213(a)(1).

Although the 1966 amendments did not include "preschools" in the new statutory formula, they were added to the law in the Education Amendments of 1972.[6] A brief gloss in the House Report suggests that "preschools" were incorporated into the law, based on economic characteristics that they share with elementary and secondary schools.[7] However, the specific exemption for teachers was not extended to include employees who teach in "preschools," though the general language of the "professional capacity" exemption would still seem to be applicable.

The United States Department of Labor, the federal agency that has the greatest expertise in administering federal fair labor standards law, directs us to a 1974 opinion letter issued by its Wage–Hour Administrator concerning whether certain child-custodial programs would be eligible for a retail-establishment exemption. In pertinent part, the opinion stated:

> There is no legislative history on preschools which might provide guidance as to Congressional desire and intent in regard to the scope of the term "preschools[."] However ... it is the Wage and Hour Division's position that kindergartens, nursery schools, *day care centers, and other preschools* provide some elements of basic education and, therefore, are outside the retail concept.... 
>
> Therefore, we find that no readily recognizable criteria can be established to set apart the two types of preschool facilities for purposes of recognizing one as retail in nature as you suggest.

Wage & Hour Opinion Letter No. 1346 (Oct. 24, 1974), Lab.L.Rep. (CCH) ¶ 30,953 (June 1973–Sept. 1978 Transfer Binder) (emphasis added). Similarly, in DOL's Field Operations Handbook (FOH), setting forth the agency's internal enforcement guidelines to assist compliance officers, "preschools" are

defined as "any enterprise ... which provides for the care and protection of infants or preschool children outside their own homes during any portion of a 24–hour day.... *This includes day care centers,* nursery schools, [and] kindergartens...." FOH § 12g03 (emphasis added); *see also Preschools Under the Fair Labor Standards Act* 2–3 (United States Dep't of Labor, Wage & Hour Pub. 1364 rev. Mar. 1976) (same).

■ Because DOL's Wage and Hour Administrator is the primary federal authority entrusted with determining the FLSA's scope, these interpretations, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which the courts and litigants may properly resort for guidance." *Mabee v. White Plains Publishing Co.,* 327 U.S. 178, 182, 66 S.Ct. 511, 513, 90 L.Ed. 607 (1946) (citing *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944)).

Two of our sister circuits have previously considered this troubling question and have arrived at opposite conclusions. In *Marshall v. Rosemont, Inc.,* 584 F.2d 319 (9th Cir. 1978), the court determined from the statutory text's listing of institutions, hospitals, and schools that "in the legislation a 'preschool' is an institution of some kind which is a part of the school system." *Id.* at 321. Therefore, the court held that the FLSA does not extend to child day care centers, which the court regarded as "essentially custodial in nature [and] in no way regulated by the State of Arizona as being a part of the state's school system." *Ibid.*

The Tenth Circuit specifically rejected the Ninth Circuit's analysis two years later. In *United States v. Elledge,* 614 F.2d 247 (10th Cir.1980), the Tenth Circuit adopted DOL's reading of the statute. Noting that Oklahoma state law did not specifically define "preschools," the court adopted an expansive definition of the term and held that child day care centers, though partly custodial and

---

**6.** Pub.L. No. 92–318, tit. IX, § 906(b)(2),(3), 1972 U.S.C.C.A.N. (86 Stat.) 278, 447.

**7.** *See* H.Rep. No. 554, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.C.C.A.N. 2462, 2567 (noting

that the word "preschool" was being added to "the existing listing of 'an elementary or secondary school' as types of activities performed for business purposes").

partly educational, are covered by the FLSA. The court noted that the statute does not distinguish between facilities that are "educational" and those that are "custodial":

> [The statute] lists hospitals, institutions for the care of the sick, the aged, the mentally ill or defective. This list is followed by reference to a school for the handicapped, and "a preschool, elementary or secondary school." Thus the section covers both custodial and educational operations. On the record presented a preschool is both custodial and educational. The fact that it is both does not relieve it of its FLSA responsibilities.

*Id.* at 250.

## III

There is much in the record to suggest that Miss Paula offers not only a custodial-care facility but also preschool learning and education. However, Miss Paula argues that custodial "child day care centers" offer learning merely as a minor adjunct to their primary function of providing custodial care. By contrast, preschools provide education as their primary service. Therefore, custodial "child day care centers" are not subsumed within the plain meaning of "preschools." According to this reasoning, if Congress nevertheless felt that such day care centers educate their charges sufficiently to be considered part of an education network that also includes preschools, elementary schools, secondary schools, and institutions of higher education, then Congress would have mentioned "day care centers" in 29 U.S.C. § 203(s)(1)(B).

We believe that such a strained reading of the text assumes more than the statute's words suggest. Custodial "child day care centers" provide services to children who are not yet required to attend school, i.e., children who are still *"pre* school." It may therefore be understandable that Congress did not enumerate custodial "child day care centers" separately because it regarded them as part of the "preschool" rubric.

Despite the apparently plain meaning of the term "preschool," Miss Paula cites Ohio law to bolster its claim that it is not a "preschool" but some other kind of entity. Indeed, Ohio law specifically distinguishes between "child day care centers" and "preschools" for licensing purposes, creating two separate "pigeon holes" to that effect, and Miss Paula is licensed as an Ohio "child day care center." In response, the government points out that although the statute allows states to define what constitutes elementary school education and what constitutes secondary school education, 29 U.S.C. § 203(v), (w), Congress did not give effect to a state's definition of "preschool." Moreover, as the magistrate judge found:

> The common sense definition of a preschool includes day care centers. The words are interchangeable in the common parlance. Although federal, not state, law is controlling, I note that Ohio's statutory scheme makes no distinction between the two which would benefit [Miss Paula]. Preschools licensed under R.C. Ch. 3301 are facilities run by school districts, county mental retardation or disabilities boards, and eligible nonpublic schools. R.C. § 3301.58. [Miss Paula] could never be licensed under R.C. Ch. 3301. Further, R.C. § 3301.52(A) defines a "preschool program" as "a child day care program for children. . . ." The term "child day care program" is defined by R.C. § 3301.52(K) to have the same meaning as in R.C. § 5104.01(A). Consequently, Ohio law defines "preschool" to be a "day care program." Finally, day care programs licensed under R.C. Ch. 5104 require day care centers to provide more than custodial care. R.C. § 5104.111. Accordingly, I find that Miss Paula's Day Care Center is a "preschool" within the meaning of 29 U.S.C. § 203(s)(1).

We agree with the magistrate judge's interpretation of this part of the federal statute and with his analysis that Ohio's licensing standards are, in any event, irrelevant to the issues at dispute in this appeal.[8]

---

8. Many states, like Ohio, do not certify institutions for young children based on a comprehensive system that defines standards for educational content. By contrast, every state has a comprehensive system by which it certifies edu-

Even if Miss Paula and other "child day care centers" were able to show that they offer no education or learning whatsoever, and that they provide nothing more than custodial child care that is comparable to professional babysitting, they would still be obligated to comply with the FLSA. Preschools are not merely educational facilities; they also perform a custodial service. Indeed, the statute includes a number of other custodial-care institutions, including "institution[s] primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises of such institution."

Ironically, Miss Paula seems to be trapped within a continuum that, at one end, compels educational institutions to comply with the FLSA and, at the other, extends the FLSA to purely custodial professional babysitting services. Thus, the FLSA *exempts* from sections 206 and 207 of the Act:

> any employee employed *on a casual basis* in domestic service employment to provide babysitting services or any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary).

29 U.S.C. § 213(a)(15) (emphasis added). The Secretary has published defining and delimiting regulations in 29 C.F.R., pt. 552. *See* 29 C.F.R. § 552.2(c). "Babysitting services" means "the custodial care and protection, during any part of the 24–hour day, of infants or children *in or about the private home* in which the infants or young children reside." *Id.* § 552.4 (emphasis added). The exemption from the FLSA does not apply to "services relating to the care and protection of infants or children which are performed by trained personnel, such as registered, vocational, or practical nurses." *Ibid.* "[T]he

term 'casual basis[,'] when applied to babysitting services, [means] employment which is irregular or intermittent, and which is not performed by an individual whose vocation is babysitting." *Id.* § 552.5.

"Babysitting is a form of domestic service, and babysitters other than those working on a casual basis are entitled to the same benefits under the Act as other domestic service employees." *Id.* § 552.103. "The rationale for [excluding those who babysit on a casual basis] is that such persons are usually not dependent upon the income from rendering such services for their livelihood.... Individuals who engage in babysitting as a full-time occupation are not employed on a 'casual basis.'" *Id.* § 552.104(a), (d).

> [A]n individual who cares for the children of others in her [sic] own home ... could, depending on the particular facts, qualify *as a preschool or day care center and thus be covered* under [29 U.S.C. § 203(s)(1)(B),] in which case the person providing the service would be required to comply with the applicable provisions of the Act.

*Id.* § 552.105(a) (emphasis added). "Employees who are engaged in providing babysitting services and who are employed by an employer or agency other than the family or household using their services are not employed on a 'casual basis' for purposes of the section 13(a)(15) [29 U.S.C. § 213(a)(15) ] exemption. Such employees are engaged in this occupation as a vocation." *Id.* § 552.109(b).

Our review of 29 U.S.C. § 213(a)(15) and the regulations that define and delimit it persuades us that even if Miss Paula is nothing more than a professional babysitting service, it is still obliged to comply with the requirements of the FLSA.[9]

---

cational institutions for children of compulsory school age.

**9.** Our analysis indicates that, ironically, Miss Paula's best line of defense against the added burdens imposed by the FLSA may be to stress the center's *educational* dimension. On this appeal, we have not been asked to decide whether the quality of preschool learning experiences that

Miss Paula's staff members provide rises to a level that could bring those employees under the FLSA's exemption for those who work in a professional capacity. 29 U.S.C. § 213(a)(1); *see Wilks v. District of Columbia*, 721 F.Supp. 1383, 1385 (D.D.C.1989) (citing *Lamb v. Rantoul*, 538 F.Supp. 34, 37 (D.R.I.1981)). We therefore leave that question for another day.

## IV

As we have noted, *see supra* note 4, the Senate was aware that extending the FLSA to public elementary and secondary schools could adversely affect them financially. Nevertheless, Congress extended the coverage to those employees, determining that the benefits of applying federal minimum-wage and overtime-pay provisions to school workers outweigh the burdens imposed on those facilities through higher operating costs.

This case is a troubling one because Miss Paula provides children in Appalachian Ohio with educational enrichment that can benefit them throughout their lives. It allows hardworking parents to study for their future growth or to work productively in the marketplace without having to deny their children the opportunity to experience the learning process. As the record makes clear, Miss Paula operates on a tight budget, and the FLSA's requirements will impose new budgetary burdens that will have to be shouldered by Miss Paula and, to some degree, by the parents. It frequently is the effect, and even the underlying purpose, of a statutory scheme like this one to destroy lowwage operations that are brought within its coverage. If that is the government's intended social policy, this court is not authorized to stand in its way. As one observer has noted, "Democracy is the theory that the common people know what they want, and deserve to get it good and hard." Henry Louis Mencken, *A Book of Burlesques* (3d ed.1920). Nevertheless, we note that, by applying equally both to educational preschool programs and to purely custodial "child day care centers," the FLSA removes any incentive that an institution might have to "dumb down" its offerings in order to avoid coverage.

## V

For the foregoing reasons, the decision of the magistrate judge is AFFIRMED.